

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 22, 2024

<u>BY ECF</u>

The Honorable John P. Cronan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

  **Re:** ***United States v. Rikesh Thapa*, 22 Cr. 654 (JPC)**

Dear Judge Cronan:

  The Government respectfully submits this letter in advance of the sentencing of Rikesh Thapa (the "defendant") on April 29, 2024.  During a nearly two-year period, the defendant stole over $1.3 million from his employer and structured financial transactions involving some of these stolen funds to avoid detection.  As set forth in the Presentence Investigation Report ("PSR"), the applicable Guidelines range is 30 to 37 months' imprisonment (the "Guidelines Range").  For the reasons set forth below, the Government submits that a sentence within the Guidelines Range would be sufficient, but not greater than necessary, to achieve the goals of sentencing.

**A.**  **Background**

  **1.**  **Offense and Relevant Conduct**

  The defendant was a co-founder and the Chief Technology Officer of a small start-up technology company ("the Victim Company") that used blockchain and other technology to provide a ticketing platform for live events.  (PSR ¶ 8).  As set forth in more detail below, during an approximately two-year period, the defendant stole at least $1,321,189 from the Victim Company, including $1 million that was entrusted to him for safekeeping; at least $319,189 worth of the Victim Company's cryptocurrency; and approximately $2,000 worth of the Victim Company's utility tokens.  (PSR ¶ 9).  The defendant deposited some of these stolen funds into his financial accounts, structuring certain transactions to avoid generating currency transaction reports ("CTRs").  (*Id.*).

  **i.**  **Theft of $1 Million Transferred for Safekeeping**

  In October 2018, the defendant agreed to receive and hold $1 million of the Victim Company's money in his personal bank account, while the Victim Company sought to decrease business risk by diversifying its banking relationships.  (PSR ¶¶ 10-11).  The defendant repeatedly acknowledged the temporary nature of his possession of the funds, saying that the money was held

for "safe keeping" and claiming that he had "not touched" it. (PSR ¶ 11). The defendant further provided the Victim Company a forged bank statement, which falsely represented that he held over $21 million, including $1 million in an account that did not exist. (PSR ¶ 12).[1] When the Victim Company requested return of the $1 million in 2019, the defendant refused, claiming that he needed to discuss potential tax consequences with an accountant and a tax attorney. (PSR ¶ 13). In fact, the defendant had by that time used the funds to pay for, among other things, personal expenses, including nightclubs, travel, and clothing. (PSR ¶ 14).

## ii. Theft of Cryptocurrency

While employed at the Victim Company, the defendant was entrusted with controlling the Victim Company's cryptocurrency holdings, which generally consisted of Bitcoin and Ethereum. (PSR ¶ 15). The defendant used this access to embezzle at least $319,189 worth of cryptocurrency. (PSR ¶¶ 15, 18). For example, in or about July 2018, the defendant sold one of the Victim Company's Bitcoin and deposited the proceeds into his personal bank account. (PSR ¶ 16). To avoid detection, the defendant created a bogus transaction report and deleted emails. (PSR ¶ 17). More specifically, after the Victim Company's CEO requested a transaction report directly from the Victim Company's cryptocurrency brokerage, the defendant disabled the CEO's email account, deleted the brokerage's email responding to the CEO, and then deleted the CEO's entire email account. (*Id.*).

## iii. Theft of Utility Tokens

In July 2019, unbeknownst to the Victim Company, the defendant set up a meeting in Italy with individuals who purported to be interested in investing in the Victim Company. (PSR ¶¶ 20-21). The defendant provided the purported investors his personal bank account information so that they could wire him funds. (PSR ¶ 21). The defendant then agreed to receive cash in exchange for a type of cryptocurrency created by the Victim Company and distributed to investors and employees, called utility tokens. (*Id.*). After meeting with the purported investors, the defendant transferred to them without authorization approximately 174,285 of the Victim Company's utility tokens, which were then worth approximately $2,000. (*Id.*). The defendant later determined that the cash he had received from the purported investors was counterfeit. (*Id.*).

## iv. Structuring Stolen Funds

While engaged in his multi-faceted theft from his employer, the defendant made deposits into his financial accounts that were designed in part to avoid generating CTRs. (PSR ¶ 22). For

---

[1] The defendant similarly provided fraudulent documents to secure leases at luxury apartment buildings in which he resided from 2019 to February 2021. (*See* PSR ¶¶ 58-59). In or about April 2019, the defendant provided The Copper, located at 626 First Avenue, with a fraudulent "Offer of Employment" letter, which falsely stated that Thapa's annual salary at the Victim Company was $550,000 per year, and a fraudulent bank statement, which falsely stated that the defendant's bank account balance was over $20 million. In or about February 2020, the defendant similarly provided to a luxury apartment building located at 1000 South Clark in Chicago several fraudulent bank statements, which falsely stated that the defendant's bank account balance was over $25 million.

example, the defendant repeatedly transferred cryptocurrency stolen from the Victim Company into an account of his and then converted that cryptocurrency into dollars that he transferred into his bank account in multiple transactions, frequently in amounts less than $10,000.  (*Id.*).

### 2.      Procedural History and Plea Agreement

On December 5, 2022, a grand jury sitting in this District returned a one-count indictment that charged the defendant with wire fraud, in violation of Title 18, United States Code, Section 1343.  The defendant was arrested on December 7, 2022, in the Southern District of California. The defendant made his initial appearance in this District on December 19, 2022.  On October 2, 2023, the defendant waived indictment and pleaded guilty, pursuant to a plea agreement (the "Plea Agreement"), to a one-count superseding information that charged him with structuring currency transactions, in violation of Title 31, United States Code, Sections 5324(a)(3) and (d)(2).  In the Plea Agreement, the parties stipulated that the applicable sentencing range under the Guidelines was 37 to 46 months' imprisonment.  In anticipation of the recent amendment of the Guidelines with respect to certain zero-point offenders, however, the parties agreed that the defendant should be sentenced as though the applicable sentencing range was 30 to 37 months' imprisonment, which is the applicable range calculated in the PSR.  (PSR ¶¶ 29-40, 93).

As part of his Plea Agreement, the defendant agreed to pay $1,321,189 in restitution.  The defendant also consented to forfeiture of the same amount.  (*See* Dkt. No. 33).  A proposed restitution order for the Court's consideration is enclosed.

### B.      Discussion

### 1.      Applicable Law

The Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion.  *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); (2) the four legitimate purposes of sentencing, as set forth below, *see id.* § 3553(a)(2); (3) "the kinds of sentences available," *id.* § 3553(a)(3); (4) the Guidelines range itself, *see id.* § 3553(a)(4); (5) any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); (6) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (7) "the need to provide restitution to any victims," *id.* § 3553(a)(7).  *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)   to afford adequate deterrence to criminal conduct;
> (C)   to protect the public from further crimes of the defendant; and
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent that a district court imposes a sentence outside the range recommended by the Guidelines, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 50) (internal quotation marks omitted).

### 2.   A Sentence Within the Guidelines Range is Appropriate

The Government respectfully submits that a sentence within the Guidelines Range of 30 to 37 months' imprisonment would be just. In particular, such a sentence is called for by the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence to promote respect for the law, provide adequate punishment, and provide deterrence.

*First*, the defendant's offense was serious, as is reflected by the duration of his criminal conduct (nearly two years), the loss amount (over $1.3 million), the means of the crime (involving repeated lies, fraudulent records, and multiple steps taken to evade detection), and the fact that the defendant abused the trust of his employer, a small startup company. The defendant's actions were far from a one-time mistake or a fleeting lapse in judgment—it was a sustained and sophisticated crime. Furthermore, as reflected in the statement submitted by the Victim Company, the defendant's conduct had serious consequences for the Victim Company.

*Second*, the sentence requested herein is necessary to reflect the history and characteristics of the defendant, promote respect for the law, and provide adequate punishment. The defendant is an educated and intelligent individual, and his crime was not one of need or an act of desperation—indeed, while he was committing the instant offense, he was earning a six-figure salary at the Victim Company. The defendant's motivation appears to have been his greed and desire to live a luxury lifestyle. (*See* PSR p. 25 ("Thapa allowed greed to cloud his judgment and it cannot be overlooked that he committed this offense while not under any financial constraints.").[2]

*Third*, a serious sentence in this case is important to help dissuade others from committing similar crimes. The legislative history of 18 U.S.C. § 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white-collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006)

---

[2] The defendant's rent at The Copper, where he lived with a colleague during 2019, was $11,350 per month.

(deterrence of white-collar crime is "of central concern to Congress"). General deterrence is an important sentencing factor in fraud and white-collar cases because it is seen as effective. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (quotation marks and citation omitted).  This Court's sentence of the defendant should send a clear message to others that serious criminal conduct will be met with serious consequences.

To be sure, there are other factors the Court can and should consider.  The Government agrees that the Court may consider the defendant's personal background and potential deportation. *See United States v. Collins*, No. 21-1291, 2023 WL 309605, at *4 (2d Cir. Jan. 19, 2023) ("[W]hile district courts are encouraged to consider such factors, they are by no means dispositive").  In addition, based on the defendant's submission, it appears that the defendant's incarceration will cause some degree of hardship to family, friends, and employees of the defendant.  Unfortunately, however, this is not uncommon and does not in the Government's view outweigh the other factors in favor of the sentence sought herein.

In addition, the Government recognizes and appreciates the Victim Company's preference that the defendant be in a position to earn money and begin paying restitution rather than incarcerated.  Nevertheless, for the reasons stated herein, the Government respectfully submits that consideration of all of the relevant sentencing factors favors a sentence of incarceration.

## C.    Conclusion

For nearly two years, the defendant stole money from his employer, lied about his criminal conduct, and took steps to avoid detection, including structuring financial transactions.  On these facts, the Government respectfully submits that a sentence within the Guidelines Range of 30 to 37 months' imprisonment would adequately reflect the seriousness of his conduct, provide just punishment, promote respect for the law, and send a message to others that a substantial jail term is the consequence of such harmful criminal actions.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:

   /s/
Timothy V. Capozzi
Assistant United States Attorney
(212) 637-2404


cc:    Defense counsel (by ECF)